**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Criminal Case No.  **23-cr-390-RMR**

UNITED STATES OF AMERICA,

     Plaintiff,

v.

1.     LARRY E. CONNER,
2.     TIMOTHY A. MCPHEE, and
3.     MARCIA G. PREDMORE,

     Defendants.

---

**INDICTMENT**

---

The Grand Jury charges:

## INTRODUCTION

At all times relevant to this Indictment:

**The Defendants and Their Entities**

1.     Defendant LARRY E. CONNER ("CONNER") was a United States citizen residing in the state of Kansas and in Frisco, Texas.

2.     From at least in or around 2016 and continuing until the date of this Indictment, CONNER promoted and sold purported tax-mitigation strategies to U.S. taxpayers in the name of THE BUSINESS SOLUTIONS GROUP ("TBSG"). CONNER operated TBSG primarily from his residence in Frisco, Texas. CONNER held TBSG out as a trade name ("doing business as" or "d/b/a") for a purported trust he created in or around 2011 called EDEN GREEN TRUST.

3.     Defendants TIMOTHY A. MCPHEE ("MCPHEE") and MARCIA G.

PREDMORE ("PREDMORE") were United States citizens residing in Estes Park, Colorado. MCPHEE and PREDMORE were married.

4.      From in or around October 1997 and continuing until the date of this Indictment, MCPHEE owned and operated COMANCHE STREET PROPERTIES LLC.

5.      In or around November 1997, MCPHEE purchased the property located at 950 Comanche Street in Estes Park, Colorado (the "Comanche Street Property") in the name of COMANCHE STREET PROPERTIES LLC.

6.      From in or around June 2000, until at least on or about December 31, 2018, MCPHEE owned and operated PROTECH PLUMBING & HEATING, INC. ("PROTECH").

7.      From in or around March 2003 and continuing until the date of this Indictment, MCPHEE owned and operated MOUNTAIN SOLITUDE LLC.

8.      From in or around May 2011 and continuing until the date of this Indictment, MCPHEE owned and operated MDH LTD LLC ("MDH LTD").

9.      From in or around February 2016, until at least on or about December 31, 2019, MCPHEE owned and operated 6307 ASH RAYTOWN LLC ("ASH RAYTOWN LLC").

10.      In or around March 2016, MCPHEE purchased the property located at 6307 Ash Street in Raytown, Missouri ("the Ash Street Property") in the name of ASH RAYTOWN LLC.

11.      From at least in or around February 2017 and continuing until the date of this Indictment, MCPHEE and PREDMORE owned and operated a business called PRIVATE BANKING CONCEPTS ("PBC"), which promoted and sold purported financial and tax-mitigation strategies to U.S. taxpayers. PBC was a registered trademark of

2

MOUNTAIN SOLITUDE LLC, and MCPHEE and PREDMORE operated PBC primarily from their residence in Estes Park, Colorado.

## Tax Terms, Forms, and Schedules

12.     The Internal Revenue Service ("IRS") was an agency of the United States Department of the Treasury responsible for enforcing and administering the tax laws of the United States and collecting taxes owed to the United States Department of the Treasury.

13.     IRS Form 1040, U.S. Individual Income Tax Return ("Form 1040") was used by some U.S. taxpayers to file an annual income tax return.

14.     Schedule E, Supplemental Income and Loss ("Schedule E") was an IRS form that was attached to a Form 1040, when applicable, and used by taxpayers to report income or loss generated from certain businesses, including LLCs, partnerships, and S Corporations.

15.     "Pass-through" income was a term used to describe the income from certain entities such as LLCs, partnerships, and S Corporations because the entity itself did not pay taxes on its income and instead "passed" that income to the entity's members, partners, or owners.

16.     IRS Form 1065, U.S. Return of Partnership Income ("Form 1065") was used by partnerships to file an annual income tax return. Under the Internal Revenue Code and associated regulations, a domestic LLC with at least two members (a "multi-member LLC") was classified as a partnership for federal income tax purposes unless it elected to be treated as a corporation.

17.     IRS Form 1120-S, U.S. Income Tax Return for an S Corporation ("Form

1120-S") was used by businesses that elected to be treated as an S Corporation to file an annual income tax return.

18. An S Corporation was a corporation that elected to pass corporate income, losses, deductions, and credits to the shareholders for federal tax purposes.

19. IRS Form 1041, U.S. Income Tax Return for Estates and Trusts ("Form 1041") was used by some trusts and estates to file an annual income tax return.

20. Schedule K-1, Partner's Share of Income, Deductions, Credits, etc. was an IRS form that was attached to a Form 1065 and used by certain business entities to report a partner's share of income and deductions.

21. Schedule K-1, Shareholder's Share of Income, Deductions, Credits, etc. was an IRS form that was attached to a Form 1120-S and used by S Corporations to report a shareholder's share of income and deductions.

22. Schedule K-1, Beneficiary's Share of Income, Deductions, Credits, etc. was an IRS form that was attached to a Form 1041, when applicable, and used by trusts to report a distribution to a beneficiary.

23. IRS Form SS-4, Application for Employer Identification Number ("Form SS-4") was used by employers, corporations, partnerships, trusts, and other entities to apply for an Employer Identification Number ("EIN"). An EIN was a unique identifier that the IRS assigned to certain business for identification purposes on income tax returns and other documents.

24. A "private foundation" was an organization that could achieve federal tax-exempt status if it was organized and operated exclusively for one or more purposes set forth in the Internal Revenue Code, including charitable, religious, educational, and

4

scientific purposes, among others. An organization was not tax exempt under the Internal Revenue Code if any part of the net earnings inured to the benefit of any private shareholder or individual.

25.    IRS Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code ("Form 1023") was a form that a private foundation filed with the IRS to apply for tax-exempt status.

26.    IRS Form 1023-EZ, Streamlined Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code ("Form 1023-EZ") was a streamlined form that certain eligible private foundations could file in lieu of a Form 1023 when applying for tax-exempt status.

27.    IRS Form 990-PF, Return of Private Foundation ("Form 990-PF") was a form used by tax-exempt private foundations and other tax-exempt entities to file an annual information return and report charitable distributions and activities.

**Definitions and Tax Rules for Trusts**

28.    Under the Internal Revenue Code and associated regulations, a trust was an arrangement in which a trustee took title to property for the purpose of protecting or conserving it for the beneficiary. Trusts were formed under state law, either by a will or by the signing of a trust agreement (also known as a "trust instrument"). A trust involved three distinct parties: a grantor, a beneficiary, and a trustee.

29.     A "grantor" was the party that initially conveyed money, property, or other assets to the trust and thereby relinquished legal title of the property to the trust.

30.    A "beneficiary" was the party that benefitted from the assets conveyed to the trust.

31.     A "trustee" was the party responsible for managing the trust's assets for the benefit of the beneficiary.

32.     A "grantor trust" was a trust over which the grantor retained the power to control and direct the trust's income and assets. When the grantor retained control of the trust assets, the income of the trust was taxed to the grantor, meaning that the grantor had a duty to report such income on the grantor's Form 1040 and pay any federal income tax owed on that income.

33.     A "non-grantor trust" was a trust over which the grantor did not retain the power to control and direct the trust's assets and instead conveyed that power to an independent trustee. The trustee was responsible for filing a Form 1041 reporting the non-grantor trust's annual income and paying any federal income tax owed on that income on the trust's behalf.

34.     A "business trust" was a type of trust generally created by its beneficiaries and used to carry on a profit-making activity. When a taxpayer carried on a profit-making business in the form of a business trust, the Internal Revenue Code and associated regulations provided that the business was to be taxed as a business entity.

35.     The Internal Revenue Code allowed non-grantor trusts to deduct costs which are paid or incurred in connection with the administration of the trust and which would not have been incurred if the property were not held in such trust.

36.     The Internal Revenue Code also allowed non-grantor trusts to deduct Distributable Net Income ("DNI"), which included the amounts paid, credited, or required to be distributed from the trust to its beneficiaries. Distributions from the trust to its beneficiaries were taxable to the beneficiary, meaning that the beneficiary had a duty to

report the distribution as income on the beneficiary's tax return and pay any federal income tax owed on that distribution.

37.     If a trust lacked "economic substance," the IRS deemed the trust to be a "sham" trust and reassigned the trust's income to the grantor in his or her individual capacity. The grantor was then responsible for reporting the trust income on a Form 1040 and paying taxes on that income.

38.     Under the Internal Revenue Code, a transaction (e.g., the creation of a trust) had economic substance if it met two requirements: First, the transaction meaningfully changed the taxpayer's economic position apart from federal income tax effects and, second, the taxpayer had a substantial purpose—apart from tax avoidance—for entering such transaction.

## **COUNT 1**
**18 U.S.C. § 371**
(Conspiracy to Defraud the United States)

39.     The allegations set forth in paragraphs 1 through 38 of this Indictment are re-alleged and incorporated as if set forth fully herein.

40.     From in or around February 2017 and continuing until the date of this Indictment, in the District of Colorado and elsewhere, defendants LARRY E. CONNER and TIMOTHY A. MCPHEE, together with others known and unknown to the Grand Jury, did, for financial gain, unlawfully, voluntarily, and knowingly conspire and agree to conspire to defraud the United States by impeding, impairing, obstructing, and defeating the lawful Government functions of the IRS of the Department of the Treasury in the ascertainment, computation, assessment, and collection of the revenue, namely, federal individual income taxes.

7

**OBJECT OF THE CONSPIRACY**

41.    From in or around February 2017 and continuing until the date of this Indictment, it was the object of the conspiracy for CONNER and MCPHEE, together with others known and unknown to the Grand Jury, to defraud the IRS by promoting and selling for financial gain a fraudulent tax shelter (hereinafter referred to as the "Abusive-Trust Tax Shelter") to U.S. taxpayers under which taxpayers fraudulently diverted nearly all of their income through a series of sham trusts and a purported charitable foundation for purposes of evading the proper assessment of taxes owed on that income.

42.    It was further the object of the conspiracy for CONNER and MCPHEE, together with others known and unknown to the Grand Jury, to assist taxpayers in creating the illusion that the funds held in the name of the sham trusts and foundations were not controlled by the taxpayers individually. In reality, however, and as CONNER and MCPHEE well knew and believed, the taxpayers earned, controlled, and benefitted from the funds held in the name of the sham trusts and foundations.

**MANNER AND MEANS OF THE CONSPIRACY**

Acting interdependently, CONNER and MCPHEE, together with others known and unknown to the Grand Jury, sought to accomplish the objects of the conspiracy with the following manner and means, among others:

43.    It was part of the conspiracy that CONNER and MCPHEE, together with others known and unknown to the Grand Jury, marketed the Abusive-Trust Tax Shelter to U.S. taxpayers with the false promise that the taxpayers could lawfully eliminate taxes on nearly all of their annual business income through the use of the tax shelter.

44.    It was further part of the conspiracy that CONNER and MCPHEE, together

with others known and unknown to the Grand Jury, promoted the Abusive-Trust Tax Shelter at in-person seminars and workshops across the country. CONNER hosted seminars in the name of TBSG or the LEGACY MANAGEMENT GROUP. MCPHEE hosted seminars in the name of PBC. CONNER and MCPHEE typically charged an attendance fee at the seminars, which they taught together and separately.

45.    It was further part of the conspiracy that CONNER and MCPHEE, together with others known and unknown to the Grand Jury, instructed U.S. taxpayers (hereinafter "clients" or "prospective clients") to carry out the Abusive-Trust Tax Shelter using three sham trusts and a private family foundation. CONNER and MCPHEE instructed clients— most of whom were business owners—to assign their legitimate business income to a sham "business trust" to create the illusion that the income assigned to the sham trust was not earned by the client. The sham business trust then distributed its income to a second sham trust, which distributed its income to a third sham trust. Each trust in the series reported deductions matching or exceeding its income, and the third sham trust purportedly "donated" any remaining income to a private family foundation, which in turn "loaned" the funds back to the client's business or business trust, tax free.

46.    It was further part of the conspiracy that CONNER and MCPHEE assured clients and prospective clients that despite the reassignment of business ownership and income, the taxpayers' business operations would not change and that the clients, as trustees, would retain complete control over their businesses and the income that the businesses generated.

47.    It was further part of the conspiracy that CONNER typically charged individuals between approximately $25,000 and $50,000 to purchase the Abusive-Trust

9

Tax Shelter. CONNER and MCPHEE sent instructions directing clients to pay the fees by wire transfer to a bank account purportedly held in the name of TBSG (hereinafter the "TBSG bank account"). CONNER controlled and was a signatory for the TBSG bank account.

48.     It was further part of the conspiracy that CONNER and MCPHEE, together with others known and unknown to the Grand Jury, told clients to pay for personal expenses—such as mortgage payments, dining costs, and family weddings—with funds held in the bank accounts for the sham trusts.

49.     It was further part of the conspiracy that CONNER and MCPHEE, together with others known and unknown to the Grand Jury, directed clients to transfer real estate and other assets, such as vehicles, to the clients' sham trusts to create the illusion that the clients did not own those assets and ultimately to avoid paying income taxes on any capital gains incurred from selling those assets. CONNER and MCPHEE assured clients that after conveying personal property to their sham trusts, the clients would retain full dominion and control over the use and enjoyment of the property.

50.     It was further part of the conspiracy that CONNER and MCPHEE, together with others known and unknown to the Grand Jury, directed clients to report income and deductions on Forms 1040 and Forms 1041 in a manner that fraudulently eliminated nearly all taxes owed.

51.     It was further part of the conspiracy that MCPHEE recruited and referred prospective clients to CONNER to purchase the Abusive-Trust Tax Shelter. MCPHEE did so with the assistance of UNINDICTED CO-CONSPIRATOR 1 ("CC-1").

52.     It was further part of the conspiracy that CONNER and MCPHEE relied on

the assistance of UNINDICTED CO-CONSPIRATOR 2 ("CC-2"), among others known and unknown to the Grand Jury, for the drafting of the trust and foundation instruments.

53.    It was further part of the conspiracy that CONNER and MCPHEE referred clients to tax-return preparers who prepared tax returns consistent with the Abusive-Trust Tax Shelter. These return preparers included, among others known and unknown to the Grand Jury, RETURN PREPARER 1 ("RP-1"), RETURN PREPARER 2 ("RP-2"), and RETURN PREPARER 3 ("RP-3"). The clients paid these return preparers directly for their services, which included, among others, the preparation and filing of Forms 1040 and Forms 1041.

54.    It was further part of the conspiracy that CONNER and MCPHEE referred clients to a business (the "ACCOUNTING FIRM") that provided accounting and bookkeeping services consistent with the Abusive-Trust Tax Shelter. ACCOUNTANT 1 ("AC-1") owned and operated the ACCOUNTING FIRM and employed ACCOUNTANT 2 ("AC-2"), among others known and unknown to the Grand Jury, to provide accounting and bookkeeping services to clients who purchased the Abusive-Trust Tax Shelter. AC-1 also partnered with RP-1 to jointly market their accounting, bookkeeping, and return-preparation services to clients.

55.    It was further part of the conspiracy that RP-1, RP-2, and RP-3 prepared and filed many false and fraudulent Forms 1040 and Forms 1041 for CONNER and MCPHEE's clients in accordance with CONNER's and MCPHEE's guidance. The preparation and filing of these false and fraudulent federal income tax returns caused a loss of tens of millions of dollars to the United States Treasury in the form of unpaid federal income taxes.

11

56.    It was further part of the conspiracy that CONNER and MCPHEE assured many individuals, including clients and prospective clients, that the Abusive-Trust Tax Shelter was a legal tax-reduction method, despite knowing that it was created and designed to fraudulently shelter a significant portion of U.S. taxpayers' income from the IRS. For example, CONNER and MCPHEE created and circulated materials responding to warnings posted on the IRS's website about abusive trust tax evasion schemes. CONNER and MCPHEE also criticized the opinions of outside accountants who questioned the legality of the Abusive-Trust Tax Shelter, claiming that those accountants simply did not understand it.

## OVERT ACTS

In furtherance of the conspiracy, the following overt acts were committed within the District of Colorado and elsewhere, among others:

57.    On or about February 18, 2017, CONNER taught a seminar promoting the Abusive-Trust Tax Shelter at a PBC event hosted by MCPHEE and PREDMORE in Denver, Colorado.

58.    On or about August 22, 2017, CONNER emailed client J.B. three documents titled "Certification of Trustee," one for each of J.B.'s sham trusts.

59.    On or about December 1, 2017, CONNER emailed client S.T.B. instructions on how to set up S.T.B.'s dental practice as a multi-member LLC.

60.    On or about February 1, 2018, CONNER emailed client S.T.B. an application (hereinafter the "TBSG Application") for three sham trusts and a private family foundation along with wiring instructions for payment to the TBSG bank account.

61.    On or about February 1, 2018, CONNER emailed client J.B. a copy of a

12

slideshow (hereinafter the "TBSG Slideshow"), which showed step-by-step how the Abusive-Trust Tax Shelter could be used to avoid taxation on all income assigned to a sham business trust.

62.    On or about February 9, 2018, CONNER emailed CC-2 the TBSG Application for client S.T.B. along with a cover letter stating that CONNER sent a cashier's check for $4,000 for the trust instruments.

63.    On or about February 24, 2018, MCPHEE hosted a workshop promoting the Abusive-Trust Tax Shelter in the name of PBC at a hotel in Fort Collins, Colorado. An email promoting the workshop stated that the topics would include "tax protection" and "how to recapture the money that is leaving your household never to be seen again without having to earn more."

64.    On or about February 28, 2018, MCPHEE emailed CONNER to inquire about a referral agreement, writing: "A quick reminder I still need the power point and the audio of the phone call as well as the referral agreement. . . . I have a fourth client that wants the info now as well."

65.    On or about March 15, 2018, CONNER emailed client S.T.B. three documents titled "Certification of Trustee," one for each of S.T.B.'s sham trusts, writing: "These are the documents needed to set up bank accounts. Each trust has its own certification of trustee form. Get them all notarized prior to going to the bank. Simply give these documents to bank personnel stating 'I would like to open irrevocable trust accounts.' Under no circumstance[s] give them your trust documents (they are private contracts) even if they say we got to have them. Call me from [the] bank and I will speak with them."

66.    On or about April 23, 2018, CONNER emailed MCPHEE the TBSG Slideshow and wrote: "As we discussed. . . . I will get you that agreement we spoke of as soon as I get back to office." CONNER also attached to the email a slideshow titled "Illustration: Family Trust Asset Acquisition." The slideshow included a slide titled, "You Should Know the Answers to These Questions" and provided answers to the following questions, among others: What is the purpose of a trust? What is the purpose of a complex irrevocable trust? What are the advantages of assets within a complex irrevocable trust?

67.    On or about September 4, 2018, CONNER emailed client R.U. three documents titled "Certification of Trustee," one for each of R.U.'s sham trusts, along with copies of letters from the IRS assigning R.U.'s sham trusts an EIN. In the email body, CONNER wrote: "[S]ee attached, the above forms: there is one for each of the trust[s]. Only use these forms when trust verification is requested. Your documents are private contracts and no one should review your governing instrument."

68.    On or about September 24, 2018, MCPHEE referred prospective clients B.V. and J.V. to CONNER via email. When describing the prospective clients to CONNER, MCPHEE wrote: "We have had the privilege of getting to know them over the last few months and are working on a Private Banking Concepts™ program for them. Through years of hard work and perseverance they have created an amazing business and lifestyle which they need to protect from those who would like to take it from them includ[ing] the IRS. . . . As we worked through an understanding of their finances it became apparent that they are an excellent candidate for the work that you do and have done for us and many of our other clients. I have shared an overview of the system with

14

them and told them I would make an introduction." MCPHEE attached the TBSG Slideshow to the email.

69.     On or about September 25, 2018, CONNER emailed client J.B. a link to register for CONNER's "advanced workshop" in Cabo San Lucas, Mexico.

70.     On or about December 1st and 2nd, 2018, CONNER taught a seminar promoting the Abusive-Trust Tax Shelter at a hotel in Irving, Texas.

71.     On or about December 8, 2018, CONNER emailed client S.B. a questionnaire (hereinafter the "TBSG Questionnaire") and wrote: "Please review and complete the enclosed questionnaire. Once you have completed the document, we can schedule a time to map a specific plan for you."

72.     On or about December 13, 2018, CONNER emailed client S.B. a flowchart illustrating how income would move from S.B.'s business entities to S.B.'s sham trusts and foundation, writing: "Flow chart as it pertains to income you control."

73.     On or about February 28, 2019, CONNER emailed client P.R. the TBSG Slideshow.

74.     On or about March 18, 2019, CONNER emailed client S.B. the TBSG Application for three sham trusts and a private family foundation and attached to the email a service agreement and wiring instructions for payment to the TBSG bank account.

75.     On or about March 18, 2019, CONNER emailed client G.R. the TBSG Slideshow.

76.     On or about March 27, 2019, MCPHEE assured client P.R. of the Abusive-Trust Tax Shelter's legality in an email reading: "What I have personally found is that this is the cleanest structure I have used in 40 years of business and personal finance."

15

MCPHEE added: "As I shared in the class, when we were last with you, I do not fear because I am not relying on what someone told me, but instead on the letters from the IRS telling me that I am to file a 1041 tax return and a letter from the IRS telling me that my foundation is tax exempt. As long as I follow the rules from the IRS, not some 'Cheat the system guru' I have no fear."

77.   On or about April 8, 2019, CONNER emailed client S.B.'s TBSG Application for three sham trusts to CC-2 for the preparation of the trust instruments, along with a cover letter stating that CONNER would also send a cashier's check for $4,000 for the trust instruments.

78.   On or about April 8, 2019, CONNER emailed client S.B. a document titled "Abusive Trust Arrangements," which provided responses to warnings on the IRS's website about abusive trust tax evasion schemes and purported to explain why the Abusive-Trust Tax Shelter differed from the schemes described in the warnings. CONNER wrote in the email body: "Explanation regarding abusive trust."

79.   On or about April 23, 2019, CONNER emailed client P.R.'s TBSG Application for three sham trusts to CC-2 for the preparation of the trust instruments, along with a cover letter stating that CONNER would also send a cashier's check for $4,000 for the trust instruments.

80.   On or about April 26, 2019, CONNER emailed client G.R.'s TBSG Application for three sham trusts and a private family foundation to CC-2 for the preparation of the trust and foundation instruments, along with a cover letter stating that CONNER would also send a cashier's check for $4,000 for the trust instruments and $7,500 for the foundation instrument.

81.     On or about May 1, 2019, CONNER emailed client S.B.'s TBSG Application for a purported private family foundation to CC-2 for the preparation of the foundation instrument, along with a cover letter stating that CONNER would also send a cashier's check for $7,500 for the foundation instrument.

82.     On or about May 2, 2019, CONNER emailed client S.B. a copy of a letter from the IRS assigning an EIN to S.B.'s sham business trust and wrote: "[Y]ou will need this to get [the] bank account set up. Can only get one trust per Trustee per day. You can wait to get all EINs before going to the bank or you can set up Business trust first and then set the other two up at [the] same time. It doesn't matter."

83.     On or about May 24, 2019, CONNER emailed client G.R. copies of letters from the IRS assigning an EIN to each of G.R.'s sham trusts, directing G.R. to "use [the] information on these copies to open bank accounts for each trust" and warning G.R. to "[p]rovide this information on SS4 form to banker along with your banking documents from your trust packages ONLY."

84.     On or about June 1, 2019, CONNER emailed client J.B. the TBSG Application and wiring instructions for payment to the TBSG bank account.

85.     On or about June 27, 2019, CONNER emailed client R.U. an invitation to CONNER's "advanced trustee" workshop in Cabo San Lucas, Mexico, writing: "We are hosting another advanced trustee workshop in Cabo San Lucas, Mexico on November 2nd and 3rd 2019. During this event, we will dive deeper into the inner workings and day-to-day management of the trust series, private family foundation, business structures, tax strategies, financial tools, and more."

86.     On or about August 2, 2019, CONNER emailed client B.R.'s TBSG

17

Application for three sham trusts and private family foundation to CC-2 for the preparation of the trust and foundation instruments.

87.     On or about August 20, 2019, CONNER emailed client D.J. the TBSG Application for three sham trusts and private family foundation along with the wiring instructions for payment to the TBSG bank account.

88.     On or about September 12, 2019, MCPHEE referred two prospective clients, S.F. and J.F., to CONNER via email. MCPHEE attached the TBSG Slideshow and TBSG Questionnaire to his email and wrote to the prospective clients: "Please fill out [the] TBSG Questionnaire, attached, and return [it] to [CONNER], prior to your meeting/call, as this is information he will need to properly structure your account and to answer questions about your structure."

89.     On or about October 23, 2019, CONNER emailed client B.R. copies of letters from the IRS assigning an EIN to each of B.R.'s sham trusts.

90.     On or about November 2nd and 3rd, 2019, CONNER hosted an "advanced trustee" workshop in Cabo San Lucas, Mexico, at which he taught about the Abusive-Trust Tax Shelter.

91.     In or around February 2020, MCPHEE referred prospective clients B.W. and S.P.-W. to CONNER to purchase the Abusive-Trust Tax Shelter.

92.     On or about March 9, 2020, CONNER emailed clients B.W. and S.P.-W.'s TBSG Application for three sham trusts to CC-2 for the preparation of the trust instruments, along with a cover letter stating that CONNER would also send a cashier's check for $4,000 for the trust instruments.

93.     On or about April 2, 2020, CONNER emailed client J.H. a document titled

18

"Audit explanation" in response to J.H.'s email to CC-2 about a letter J.H. received from the IRS. The document contained scripted responses to questions about the nature of the purported private family foundation used to carry out the Abusive-Trust Tax Shelter.

94.    On or about June 2, 2020, MCPHEE and PREDMORE referred client R.U. via email to AC-1 and RP-1 for accounting, bookkeeping, and return-preparation services consistent with the Abusive-Trust Tax Shelter.

95.    On or about September 12, 2020, MCPHEE referred client B.B. via email to AC-1 and RP-1 for accounting, bookkeeping, and return-preparation services consistent with the Abusive-Trust Tax Shelter. MCPHEE wrote to AC-1 and RP-1: "B.B is a dear friend/client and is in need of accounting and CPA services. [B.B. is] going to need expertise and guidance for the accounting/bookkeeping for business and the Trusts Systems." MCPHEE then addressed B.B., writing: "[AC-1] & [RP-1] have become referral partners. [AC-1] is a friend and client so [AC-1] understands the needs that our clients have. [AC-1] is a master at what [AC-1] does with the . . . bookkeeping and accounting services. [RP-1] is amazing with tax strategy, and also understands the 1040/1041 tax filings for the Trust system."

96.    On or about October 12, 2020, CONNER forwarded client B.B.'s TBSG Application for three sham trusts to CC-2 for the preparation of the trust instruments, along with a cover letter stating that CONNER would also send a cashier's check for $4,000 for the trust instruments.

97.    On or about November 2, 2020, MCPHEE referred via email clients P.R. and E.A. to AC-1 and RP-1 for accounting, bookkeeping, and return-preparation services consistent with the Abusive-Trust Tax Shelter.

98.     On or about June 17, 2021, CONNER sent client J.D.B. an email with the subject line "ABUSIVE TRUST Response" and attached a document titled "Abusive Trust Arrangements," which provided responses to warnings on the IRS's website about abusive trust tax evasion schemes and purported to explain why the Abusive-Trust Tax Shelter differed from the schemes described in the warnings.

99.     On or about June 23, 2021, CONNER emailed client R.U. and directed R.U. to treat funds that R.U. transferred from his sham family trust's bank account to his personal bank account as "income or asset[s]" of R.U.'s sham family trust, not as "personal income or asset[s]."

100.    On or about August 12, 2021, MCPHEE advised clients B.B. and D.R. how to navigate the sale of their businesses or real estate assets while using the Abusive-Trust Tax Shelter. MCPHEE copied CONNER on his email to B.B. and D.R. and wrote: "Make sure you are strategizing with [CONNER] on business sales."

101.    On or about September 2, 2021, MCPHEE emailed clients A.S. and J.S. to invite them to a seminar about the Abusive-Trust Tax Shelter hosted by CONNER in Dallas, Texas on September 18th and 19th, 2021.

102.    On or about January 31, 2022, MCPHEE promoted the Abusive-Trust Tax Shelter to an undercover agent ("UCA 1") posing as a prospective client via a videoconference. During the conversation, MCPHEE said that he knew of a trust structure that could reduce UCA 1's tax liability by about 95% to 98%. MCPHEE added that he had a team of bookkeepers and accountants who could help UCA 1 "minimize taxation." MCPHEE also explained that UCA 1 could utilize a series of trusts—a "business trust," a "family trust," and a "charitable trust"—to "deal" with the taxes owed for businesses or

investments.

103.    On or about February 19, 2022, MCPHEE met in-person with UCA 1 at a restaurant in Estes Park, Colorado and explained in detail how taxpayers can use the Abusive-Trust Tax Shelter to substantially reduce their tax liability. MCPHEE explained that there was "[n]o limitations whatsoever at all" on how a taxpayer could spend the money held in a trust and said that all the money spent from a trust bank account—for example on a pool, car, meals, gifts, entertainment, or home renovations—is a deduction.

104.    On or about March 19th and 20th, 2022, CONNER taught a seminar at a hotel in Frisco, Texas promoting the Abusive-Trust Tax Shelter.

105.    On or about January 29, 2023, MCPHEE taught a seminar promoting the Abusive-Trust Tax Shelter at a hotel in Austin, Texas, at which he told the audience that a taxpayer cannot claim the tax benefits MCPHEE taught about if the taxpayer was both the grantor and trustee of a trust. MCPHEE thus explained that "somebody else literally becomes the grantor, and then they turn it over to you. It'll all happen in five minutes, and they'll all turn it over to you, and now you're the trustee in charge, but they're the ones that granted the trust[.]"

In violation of Title 18, United States Code, Section 371.

**COUNTS 2 – 9**
**26 U.S.C. § 7206(2)**
(Aiding and Assisting in the Preparation of
of Materially False Income Tax Returns)

106.    The allegations set forth in paragraphs 1 through 38 and 41 through 105 of this Indictment are re-alleged and incorporated as if set forth fully herein.

107.    From in or around February 2017, through on or about May 8, 2023, in the District of Colorado and elsewhere, defendants LARRY E. CONNER and TIMOTHY A. MCPHEE willfully aided and assisted in, and procured, counseled, and advised the preparation and presentation to the IRS of materially false and fraudulent Forms 1040 for the taxpayers and calendar years set forth in the table below, each such return constituting a separate count. The Forms 1040 were false and fraudulent as to a material matter because the Forms 1040 substantially underreported the taxpayers' total income listed on the Schedules E, Line 41. CONNER and MCPHEE knew that the Forms 1040 for the taxpayers listed in the table below materially underreported the taxpayers' Schedule E income because, among other reasons, the taxpayers purchased the Abusive-Trust Tax Shelter from CONNER; CONNER and MCPHEE instructed the taxpayers to report only a small percentage of their actual income on their Forms 1040; and CONNER and MCPHEE referred the taxpayers to return preparers trained on the Abusive-Trust Tax Shelter.

| Count | Taxpayers | Year | Approx. Filing Date | False Item |
|---|---|---|---|---|
| 2 | B.B. & J.B. | 2020 | 9/8/2021 | Form 1040, Schedule E, Line 41, Total income or (loss) of $960 |
| 3 | B.B. & J.B. | 2021 | 9/1/2022 | Form 1040, Schedule E, Line 41, Total income or (loss) of $3,183 |
| 4 | B.B. & J.B. | 2022 | 5/8/2023 | Form 1040, Schedule E, Line 41, Total income or (loss) of $11,923 |
| 5 | S.F. & J.F. | 2021 | 4/15/2022 | Form 1040, Schedule E, Line 41, Total income or (loss) of -$17,728 |
| 6 | S.F. & J.F. | 2022 | 4/18/2023 | Form 1040, Schedule E, Line 41, Total income or (loss) of $38,892 |
| 7 | A.S. & J.S. | 2021 | 9/15/2022 | Form 1040, Uschedule E, Line 41, Total income or (loss) of $69,725 |

22

| 8 | R.U. & Y.U. | 2020 | 9/17/2021 | Form 1040, Schedule E, Line 41, Total income or (loss) of $49,949 |
| 9 | B.W. & S.P.-W. | 2021 | 8/24/2022 | Form 1040, Schedule E, Line 41, Total income or (loss) of $83,086 |

In violation of Title 26, United States Code, Section 7206(2).

## COUNT 10
## 26 U.S.C. § 7201
(Evasion of Assessment of Taxes for Tax Year 2016)

108.   The allegations set forth in paragraphs 1 through 38 and 41 through 105 of this Indictment are re-alleged and incorporated as if set forth fully herein.

109.   From on or about September 9, 2016, through on or about October 15, 2019, in the District of Colorado and elsewhere, defendants TIMOTHY A. MCPHEE and MARCIA G. PREDMORE willfully attempted to evade and defeat a substantial amount of income tax due and owing by them to the United States of America for tax year 2016 by committing at least one of the following affirmative acts of evasion, among others:

a.   The acts described in paragraphs 57, 63, 64, 68, 76, 88, 91, 94, 95, 97, 100, 101, 102, 103, and 105 of this Indictment.

b.   On or about September 9, 2016, MCPHEE and PREDMORE signed a document titled "Declaration of Trust Agreement" that purported to create an entity called the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION. MCPHEE and PREDMORE named themselves as trustees of the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION.

c.   On or about September 30, 2016, MCPHEE filed and caused to be filed with the IRS a Form 1023-EZ on behalf of the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION seeking recognition of exempt status

23

under Section 501(c)(3) of the Internal Revenue Code.

d.   On or about November 7, 2016, MCPHEE and PREDMORE signed a trust instrument that purported to create an irrevocable "Pure Trust Organization in Common Law" called MOUNTAIN SOLITUDE TRUST. The same day, MCPHEE also signed a second version of the trust instrument, referred to as "Banking Documents," which purported to create an "irrevocable trust" called MOUNTAIN SOLITUDE TRUST. MCPHEE and PREDMORE referred to MOUNTAIN SOLITUDE TRUST as a "business trust" and named themselves as trustees.

e.   On or about November 7, 2016, MCPHEE and PREDMORE signed a trust instrument that purported to create an irrevocable "Pure Trust Organization in Common Law" called MDH TRUST. The same day, MCPHEE also signed a second version of the trust instrument, referred to as "Banking Documents," which purported to create an "irrevocable trust" called MDH TRUST. MCPHEE and PREDMORE referred to MDH TRUST as a "business trust" and named themselves as trustees.

f.   On or about November 7, 2016, MCPHEE and PREDMORE signed a trust instrument that purported to create an irrevocable "Pure Trust Organization in Common Law" called MDH FAMILY TRUST. The same day, MCPHEE also signed a second version of the trust instrument, referred to as "Banking Documents," which purported to create an "irrevocable trust" called MDH FAMILY TRUST. MCPHEE and PREDMORE referred to MDH FAMILY TRUST as a "family trust" and named themselves as trustees.

24

g. On or about November 7, 2016, MCPHEE and PREDMORE signed a trust instrument that purported to create an irrevocable "Pure Trust Organization in Common Law" called HER CHARITABLE TRUST. The same day, MCPHEE also signed a second version of the trust instrument, referred to as "Banking Documents," which purported to create an "irrevocable trust" called HER CHARITABLE TRUST. MCPHEE and PREDMORE referred to HER CHARITABLE TRUST as a "charitable trust" and named themselves as trustees.

h. On or about November 8, 2016, MCPHEE and PREDMORE opened an account for MDH FAMILY TRUST at a bank ("Bank A"), account number ******5338, for which MCPHEE and PREDMORE had sole signature authority.

i. On or about November 8, 2016, MCPHEE and PREDMORE provided Bank A with a signed and notarized document titled "Certification of Trust," which represented that MDH FAMILY TRUST was created on February 23, 2016.

j. On or about November 8, 2016, MCPHEE and PREDMORE opened a bank account for the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION at Bank A, account number ******5350, for which MCPHEE and PREDMORE had sole signature authority.

k. On or about November 16, 2016, MCPHEE and PREDMORE provided Bank A with a signed and notarized document titled "Certification of Trust," which represented that the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION was created on August 22, 2016.

25

l. On or about November 16, 2016, MCPHEE and PREDMORE opened a bank account for HER CHARITABLE TRUST at Bank A, account number ******5422, for which MCPHEE and PREDMORE had sole signature authority.

m. On or about November 17, 2016, MCPHEE and PREDMORE opened a bank account for MDH TRUST at Bank A, account number ******5434, for which MCPHEE and PREDMORE had sole signature authority.

n. On or about November 18, 2016, MCPHEE and PREDMORE opened a bank account for MOUNTAIN SOLITUDE TRUST at Bank A, account number ******5446, for which MCPHEE and PREDMORE had sole signature authority.

o. On or about November 21, 2016, MCPHEE and PREDMORE provided Bank A with a signed and notarized document titled "Certification of Trust," which represented that the "Grantor(s) or Settlor(s)" of HER CHARITABLE TRUST was MDH FAMILY TRUST.

p. On or about November 21, 2016, MCPHEE and PREDMORE provided Bank A with a signed and notarized document titled "Certification of Trust," which represented that the "Grantor(s) or Settlor(s)" of MDH TRUST was an individual with the initials G.R.

q. On or about November 21, 2016, MCPHEE and PREDMORE provided Bank A with a signed and notarized document titled "Certification of Trust," which represented that the "Grantor(s) or Settlor(s)" of MOUNTAIN SOLITUDE TRUST was an individual with the initials G.R.

r. On or about January 1, 2017, PREDMORE purported to convey MCPHEE and PREDMORE's personal residence in Larimer County, Colorado by quitclaim deed—that is, a document used to transfer property from one party to another—to MDH FAMILY TRUST. MCPHEE and PREDMORE, however, maintained complete and beneficial use of the property after transferring title to MDH FAMILY TRUST.

s. On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a Form 1120-S on behalf of PROTECH for tax year 2016 that included a Schedule K-1 assigning 95% of PROTECH's ordinary business income for tax year 2016 to MDH TRUST. MCPHEE did so despite retaining full dominion and control over the income assigned from PROTECH to MDH TRUST.

t. On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of COMANCHE STREET PROPERTIES LLC for tax year 2016 that included a Schedule K-1 assigning 95% of COMANCHE STREET PROPERTIES LLC's ordinary business income for tax year 2016 to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite retaining full dominion and control over the income assigned from COMANCHE STREET PROPERTIES LLC to MOUNTAIN SOLITUDE TRUST.

u. On or about October 15, 2019, MCPHEE and PREDMORE filed and caused to be filed with the IRS a false and fraudulent joint Form 1040 for tax year 2016 that materially underreported MCPHEE and PREDMORE's total

27

income for tax year 2016.

v. On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MDH TRUST for tax year 2016 that fraudulently assigned to MDH TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2016 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2016 as "Other Deductions" on Line 15a.

w. On or about October 15, 2019, PREDMORE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MOUNTAIN SOLITUDE TRUST for tax year 2016 that fraudulently assigned to MOUNTAIN SOLITUDE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2016.

x. On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MDH FAMILY TRUST for tax year 2016 that fraudulently assigned to MDH FAMILY TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2016 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2016 as "Other Deductions" on Line 15a.

y. On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of HER CHARITABLE TRUST for tax year 2016 that fraudulently assigned to HER CHARITABLE

TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2016 and that fraudulently reported that HER CHARITABLE TRUST made $658,880 in charitable donations in 2016 when, in reality, HER CHARITABLE TRUST did not make charitable donations in that amount.

In violation of Title 26, United States Code, 7201.

## COUNT 11
### 26 U.S.C. § 7201
(Evasion of Assessment of Taxes for Tax Year 2017)

110.   The allegations set forth in paragraphs 1 through 38, 41 through 105, and 109 of this Indictment are re-alleged and incorporated as if set forth fully herein.

111.   From on or about September 9, 2016, through on or about October 15, 2019, in the District of Colorado and elsewhere, defendants TIMOTHY A. MCPHEE and MARCIA G. PREDMORE willfully attempted to evade and defeat a substantial amount of income tax due and owing by them to the United States of America for tax year 2017 by committing at least one of the following affirmative acts of evasion, among others:

a. The acts described in paragraphs 57, 63, 64, 68, 76, 88, 91, 94, 95, 97, 100, 101, 102, 103, and 105 of this Indictment.

b. The affirmative acts of evasion set forth in Count 10, paragraph 109.

c. From on or about April 1, 2017, through on or about December 31, 2017, MCPHEE and PREDMORE paid for personal expenses with funds held in the bank accounts for MDH FAMILY TRUST (account number ******5388) and MOUNTAIN SOLITUDE TRUST (account number ******5446).

d. On or about October 15, 2019, MCPHEE filed and caused to be filed with

29

the IRS a Form 1120-S on behalf of PROTECH for tax year 2017 that included a Schedule K-1 assigning 95% of PROTECH's ordinary business income for tax year 2017 to MDH TRUST. MCPHEE did so despite retaining full dominion and control over the income assigned from PROTECH to MDH TRUST.

e.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of MDH LTD for tax year 2017 that included a Schedule K-1 assigning 90% of MDH LTD's ordinary business income for tax year 2017 to MDH TRUST. MCPHEE did so despite retaining full dominion and control over the income assigned from MDH LTD to MDH TRUST.

f.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of COMANCHE STREET PROPERTIES LLC for tax year 2017 that included a Schedule K-1 assigning 95% of COMANCHE STREET PROPERTIES LLC's ordinary business income for tax year 2017 to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite retaining full dominion and control over the income assigned from COMANCHE STREET PROPERTIES LLC to MOUNTAIN SOLITUDE TRUST.

g.  On or about October 15, 2019, PREDMORE filed and caused to be filed with the IRS a Form 1065 on behalf of MOUNTAIN SOLITUDE LLC for tax year 2017 that included a Schedule K-1 assigning 90% of MOUNTAIN SOLITUDE LLC's ordinary business income to MOUNTAIN SOLITUDE

TRUST. PREDMORE did so despite retaining full dominion and control over the income assigned from MOUNTAIN SOLITUDE LLC to MOUNTAIN SOLITUDE TRUST.

h. On or about October 15, 2019, MCPHEE and PREDMORE filed and caused to be filed with the IRS a false and fraudulent joint Form 1040 for tax year 2017 that materially underreported MCPHEE and PREDMORE's total income for tax year 2017.

i. On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MDH TRUST for tax year 2017 that fraudulently assigned to MDH TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2017.

j. On or about October 15, 2019, PREDMORE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MOUNTAIN SOLITUDE TRUST for tax year 2017 that fraudulently assigned to MOUNTAIN SOLITUDE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2017 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2017 as "Other Deductions" on Line 15a.

k. On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MDH FAMILY TRUST for tax year 2017 that fraudulently assigned to MDH FAMILY TRUST income

31

that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2017 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2017 as "Other Deductions" on Line 15a.

l.   On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of HER CHARITABLE TRUST for tax year 2017 that fraudulently and improperly assigned to HER CHARITABLE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2017 and that fraudulently reported that HER CHARITABLE TRUST made $269,746 in charitable donations in 2017 when, in reality, HER CHARITABLE TRUST did not make charitable donations in that amount.

In violation of Title 26, United States Code, 7201.

### COUNT 12
### 26 U.S.C. § 7201
(Evasion of Assessment of Taxes for Tax Year 2018)

112.   The allegations set forth in paragraphs 1 through 38, 41 through 105, 109, and 111 of this Indictment are re-alleged and incorporated as if set forth fully herein.

113.   From on or about September 9, 2016, through on or about November 16, 2020, in the District of Colorado and elsewhere, defendants TIMOTHY A. MCPHEE and MARCIA G. PREDMORE willfully attempted to evade and defeat a substantial amount of income tax due and owing by them to the United States of America for tax year 2018 by committing at least one of the following affirmative acts of evasion, among others:

a.   The acts described in paragraphs 57, 63, 64, 68, 76, 88, 91, 94, 95, 97, 100,

32

101, 102, 103, and 105 of this Indictment.

b.  The affirmative acts of evasion set forth in Count 10, paragraph 109 and Count 11, paragraph 111.

c.  From on or about January 1, 2018, through on or about December 31, 2018, MCPHEE and PREDMORE paid for personal expenses with funds held in the bank accounts for MDH FAMILY TRUST (account number ******5388) and MOUNTAIN SOLITUDE TRUST (account number ******5446).

d.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of MDH LTD for tax year 2018 that included a Schedule K-1 assigning 90% of MDH LTD's ordinary business income for tax year 2018 to MDH TRUST. MCPHEE did so despite retaining full dominion and control over the income assigned from MDH LTD to MDH TRUST.

e.  On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of COMANCHE STREET PROPERTIES LLC for tax year 2018 that included a Schedule K-1 assigning 95% of COMANCHE STREET PROPERTIES LLC's ordinary business income for tax year 2018 to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite retaining full dominion and control over the income assigned from COMANCHE STREET PROPERTIES LLC to MOUNTAIN SOLITUDE TRUST.

f.  On or about October 15, 2019, PREDMORE filed and caused to be filed with the IRS a Form 1065 on behalf of MOUNTAIN SOLITUDE LLC for tax

33

year 2018 that included a Schedule K-1 assigning 90% of MOUNTAIN SOLITUDE LLC's ordinary business income to MOUNTAIN SOLITUDE TRUST. PREDMORE did so despite retaining full dominion and control over the income assigned from MOUNTAIN SOLITUDE LLC to MOUNTAIN SOLITUDE TRUST.

g. On or about October 15, 2019, MCPHEE and PREDMORE filed and caused to be filed with the IRS a false and fraudulent joint Form 1040 for tax year 2018 that materially underreported MCPHEE and PREDMORE's total income for tax year 2018.

h. On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MDH TRUST for tax year 2018 that fraudulently and improperly assigned to MDH TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2018 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2018 as "Other Deductions" on Line 15a.

i. On or about October 15, 2019, PREDMORE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MOUNTAIN SOLITUDE TRUST for tax year 2018 that fraudulently and improperly assigned to MOUNTAIN SOLITUDE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2018 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax

34

year 2018 as "Other Deductions" on Line 15a.

j. On or about October 15, 2019, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MDH FAMILY TRUST for tax year 2018 that fraudulently and improperly assigned to MDH FAMILY TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2018 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2018 as "Other Deductions" on Line 15a.

k. On or about November 12, 2019, MCPHEE filed and caused to be filed with the IRS a materially false Form 990-PF on behalf of the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION for tax year 2018 that falsely reported that the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION received $1,152,550 in contributions, gifts, grants, etc. from HER CHARITABLE TRUST when in reality HER CHARITABLE TRUST did not make contributions in that amount to the TIMOTHY AND MARCIA MCPHEE FAMILY FOUNDATION during tax year 2018.

l. On or about November 16, 2020, MCPHEE filed and caused to be filed with the IRS a materially false Amended Form 1041 on behalf of HER CHARITABLE TRUST for tax year 2018 that fraudulently and improperly assigned to HER CHARITABLE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2018 and that fraudulently reported that HER CHARITABLE TRUST

made $223,924 in charitable donations in 2018 when, in reality, HER

CHARITABLE TRUST did not make charitable donations in that amount.

In violation of Title 26, United States Code, 7201.

## COUNT 13
### 26 U.S.C. § 7201
(Evasion of Assessment of Taxes for Tax Year 2019)

114.    The allegations set forth in paragraphs 1 through 38, 41 through 105, 109, 111, and 113 of this Indictment are re-alleged and incorporated as if set forth fully herein.

115.    From on or about September 9, 2016, through on or about November 6, 2020, in the District of Colorado and elsewhere, defendants TIMOTHY A. MCPHEE and MARCIA G. PREDMORE willfully attempted to evade and defeat a substantial amount of income tax due and owing by them to the United States of America for tax year 2019 by committing at least one of the following affirmative acts of evasion, among others:

   a. The acts described in paragraphs 57, 63, 64, 68, 76, 88, 91, 94, 95, 97, 100, 101, 102, 103, and 105 of this Indictment.

   b. The affirmative acts of evasion set forth in Count 10, paragraph 109, Count 11, paragraph 111, and Count 12, paragraph 113.

   c. From on or about January 1, 2019, through on or about December 31, 2019, MCPHEE and PREDMORE paid for personal expenses with funds held in the bank accounts for MDH FAMILY TRUST (account number ******5388) and MOUNTAIN SOLITUDE TRUST (account number ******5446).

   d. On or about September 1, 2019, MCPHEE, acting as Manager of ASH RAYTOWN LLC, conveyed the Ash Street Property by quitclaim deed to MOUNTAIN SOLITUDE TRUST.

e. On or about December 10, 2019, MCPHEE, acting as trustee of MOUNTAIN SOLITUDE TRUST, sold the Ash Street Property, and MCPHEE and PREDMORE caused, and assisted in causing, proceeds from the sale to be deposited into MOUNTAIN SOLITUDE TRUST's bank account (account number ******5446). Though MCPHEE purchased the Ash Street Property in or around March 2016 in his capacity as Manager of ASH RAYTOWN LLC and though he controlled the property until its sale in December 2019, MCPHEE did not report the proceeds from the sale of the Ash Street Property on his and PREDMORE's joint Form 1040 for tax year 2019 and did not pay any income taxes on the profit from the sale.

f. On or about September 15, 2020, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of COMANCHE STREET PROPERTIES LLC for tax year 2019 that included a Schedule K-1 assigning 95% of COMANCHE STREET PROPERTIES LLC's ordinary business income for tax year 2019 to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite retaining full dominion and control over the income assigned from COMANCHE STREET PROPERTIES LLC to MOUNTAIN SOLITUDE TRUST.

g. On or about September 15, 2020, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of ASH RAYTOWN LLC for tax year 2019 that included a Schedule K-1 assigning 95% of ASH RAYTOWN LLC's ordinary business income for tax year 2019 to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite retaining full dominion and control over

37

the income assigned from ASH RAYTOWN LLC to MOUNTAIN SOLITUDE TRUST.

h. On or about September 15, 2020, PREDMORE filed and caused to be filed with the IRS a Form 1065 on behalf of MOUNTAIN SOLITUDE LLC for tax year 2019 that included a Schedule K-1 assigning 90% of MOUNTAIN SOLITUDE LLC's ordinary business income to MOUNTAIN SOLITUDE TRUST. PREDMORE did so despite retaining full dominion and control over the income assigned from MOUNTAIN SOLITUDE LLC to MOUNTAIN SOLITUDE TRUST.

i. On or about October 15, 2020, MCPHEE and PREDMORE filed and caused to be filed with the IRS a false and fraudulent joint Form 1040 for tax year 2019 that materially underreported MCPHEE and PREDMORE's total income for tax year 2019.

j. On or about October 15, 2020, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MDH TRUST for tax year 2019 that fraudulently and improperly assigned to MDH TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2019.

k. On or about October 15, 2020, PREDMORE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MOUNTAIN SOLITUDE TRUST for tax year 2019 that fraudulently and improperly assigned to MOUNTAIN SOLITUDE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax

year 2019 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2019 as "Other Deductions" on Line 15a.

l.   On or about October 15, 2020, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MDH FAMILY TRUST for tax year 2019 that fraudulently and improperly assigned to MDH FAMILY TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2019 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2019 as "Other Deductions" on Line 15a.

m.   On or about October 15, 2020, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of HER CHARITABLE TRUST for tax year 2019 that fraudulently and improperly assigned to HER CHARITABLE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2019.

In violation of Title 26, United States Code, 7201.

## COUNT 14
### 26 U.S.C. § 7201
(Evasion of Assessment of Taxes for Tax Year 2020)

116.   The allegations set forth in paragraphs 1 through 38, 41 through 105, 109, 111, 113, and 115 of this Indictment are re-alleged and incorporated as if set forth fully herein.

117.   From on or about September 9, 2016, through on or about October 1, 2021,

in the District of Colorado and elsewhere, defendants TIMOTHY A. MCPHEE and MARCIA G. PREDMORE willfully attempted to evade and defeat a substantial amount of income tax due and owing by them to the United States of America for tax year 2020 by committing at least one of the following affirmative acts of evasion, among others:

a. The acts described in paragraphs 57, 63, 64, 68, 76, 88, 91, 94, 95, 97, 100, 101, 102, 103, and 105 of this Indictment.

b. The affirmative acts of evasion set forth in Count 10, paragraph 109, Count 11, paragraph 111, Count 12, paragraph 113, and Count 13, paragraph 115.

c. From on or about January 1, 2020, through on or about December 31, 2020, MCPHEE and PREDMORE paid for personal expenses with funds held in the bank accounts for MDH FAMILY TRUST (account number ******5388) and MOUNTAIN SOLITUDE TRUST (account number ******5446).

d. From on or about March 30, 2020, through on or about December 23, 2020, MCPHEE directed income received in the form of commission payments from two entities with the initials HGCUKL and ITTSL related to his involvement with a purported foreign investment firm into MDH FAMILY TRUST's bank account (account number ******5338).

e. On or about March 19, 2021, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of COMANCHE STREET PROPERTIES LLC for tax year 2020 that included a Schedule K-1 assigning 95% of COMANCHE STREET PROPERTIES LLC's ordinary business income for tax year 2020 to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite retaining full dominion and control over the income assigned from

COMANCHE STREET PROPERTIES LLC to MOUNTAIN SOLITUDE TRUST.

f.  On or about March 19, 2021, PREDMORE filed and caused to be filed with the IRS a Form 1065 on behalf of MOUNTAIN SOLITUDE LLC for tax year 2020 that included a Schedule K-1 assigning 90% of MOUNTAIN SOLITUDE LLC's ordinary business income to MOUNTAIN SOLITUDE TRUST. PREDMORE did so despite retaining full dominion and control over the income assigned from MOUNTAIN SOLITUDE LLC to MOUNTAIN SOLITUDE TRUST.

g.  On or about April 25, 2021, MCPHEE and PREDMORE filed and caused to be filed with the IRS a false and fraudulent joint Form 1040 for tax year 2020 that materially underreported MCPHEE and PREDMORE's total income for tax year 2020.

h.  On or about October 1, 2021, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MDH TRUST for tax year 2020 that fraudulently assigned to MDH TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2020 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2020 as "Other Deductions" on Line 15a.

i.  On or about October 1, 2021, PREDMORE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MOUNTAIN SOLITUDE TRUST for tax year 2020 that fraudulently and improperly assigned to

41

MOUNTAIN SOLITUDE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2020 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2020 as "Other Deductions" on Line 15a.

j. On or about October 1, 2021, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MDH FAMILY TRUST for tax year 2020 that fraudulently and improperly assigned to MDH FAMILY TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2020 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2020 as "Other Deductions" on Line 15a.

k. On or about October 1, 2021, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of HER CHARITABLE TRUST for tax year 2020 that fraudulently and improperly assigned to HER CHARITABLE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2020 and that fraudulently reported that HER CHARITABLE TRUST made $70,271 in charitable donations in 2020 when, in reality, HER CHARITABLE TRUST did not make charitable donations in that amount.

In violation of Title 26, United States Code, 7201.

**COUNT 15**
**26 U.S.C. § 7201**
(Evasion of Assessment of Taxes for Tax Year 2021)

118.    The allegations set forth in paragraphs 1 through 38, 41 through 105, 109, 111, 113, 115, and 117 of this Indictment are re-alleged and incorporated as if set forth fully herein.

119.    From on or about September 9, 2016, through on or about October 3, 2022, in the District of Colorado and elsewhere, defendants TIMOTHY A. MCPHEE and MARCIA G. PREDMORE willfully attempted to evade and defeat a substantial amount of income tax due and owing by them to the United States of America for tax year 2021 by committing at least one of the following affirmative acts of evasion, among others:

a.  The acts described in paragraphs 57, 63, 64, 68, 76, 88, 91, 94, 95, 97, 100, 101, 102, 103, and 105 of this Indictment.

b.  The affirmative acts of evasion set forth in Count 10, paragraph 109, Count 11, paragraph 111, Count 12, paragraph 113, Count 13, paragraph 115, and Count 14 paragraph 117.

c.  On or about September 1, 2019, MCPHEE, acting as Manager of COMANCHE STREET PROPERTIES LLC, conveyed the Comanche Street Property by quitclaim deed to MOUNTAIN SOLITUDE TRUST.

d.  From on or about January 1, 2021, through on or about December 31, 2021, MCPHEE and PREDMORE paid for personal expenses with funds held in the bank accounts for MDH FAMILY TRUST (account number ******5388) and MOUNTAIN SOLITUDE TRUST (account number ******5446).

e.  From on or about January 13, 2021, through on or about December 2, 2021,

43

MCPHEE directed income received in the form of commission payments from an individual with the initials C.L. and from two entities with the initials ITTSL and SFTI related to his involvement with a purported foreign investment firm into MDH FAMILY TRUST's bank account (account number ******5338).

f. On or about December 22, 2021, MCPHEE, acting as trustee of MOUNTAIN SOLITUDE TRUST, sold the Comanche Street Property, and MCPHEE and PREDMORE caused, and assisted in causing, proceeds from the sale to be deposited into MOUNTAIN SOLITUDE TRUST's bank account (account number ******5446).

g. On or about September 20, 2022, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of COMANCHE STREET PROPERTIES LLC for tax year 2021 that included a Schedule K-1 assigning 98% of COMANCHE STREET PROPERTIES LLC's ordinary business income for tax year 2021 to MDH TRUST. MCPHEE did so despite retaining full dominion and control over the income assigned from COMANCHE STREET PROPERTIES LLC to MDH TRUST.

h. On or about September 15, 2022, MCPHEE filed and caused to be filed with the IRS a Form 1065 on behalf of MOUNTAIN SOLITUDE LLC for tax year 2021 that included a Schedule K-1 assigning 90% of MOUNTAIN SOLITUDE LLC's ordinary business income to MOUNTAIN SOLITUDE TRUST. MCPHEE did so despite retaining full dominion and control over the income assigned from MOUNTAIN SOLITUDE LLC to MOUNTAIN

SOLITUDE TRUST.

i.  On or about September 30, 2022, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MDH TRUST for tax year 2021 that fraudulently and improperly assigned to MDH TRUST income that MCPHEE earned, controlled, and benefitted from individually during tax year 2021 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2021 as "Other Deductions" on Line 15a.

j.  On or about September 30, 2022, PREDMORE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MOUNTAIN SOLITUDE TRUST for tax year 2021 that fraudulently and improperly assigned to MOUNTAIN SOLITUDE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2021 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2021 as "Other Deductions" on Line 15a.

k.  On or about September 30, 2022, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of MDH FAMILY TRUST for tax year 2021 that fraudulently and improperly assigned to MDH FAMILY TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2021 and that fraudulently reported personal and other non-deductible expenses incurred by MCPHEE and PREDMORE individually during tax year 2021 as "Other Deductions"

45

on Line 15a.

l.   On or about September 30, 2022, MCPHEE filed and caused to be filed with the IRS a materially false Form 1041 on behalf of HER CHARITABLE TRUST for tax year 2021 that fraudulently and improperly assigned to HER CHARITABLE TRUST income that MCPHEE and PREDMORE earned, controlled, and benefitted from individually during tax year 2021.

m.   On or about October 3, 2022, MCPHEE and PREDMORE filed and caused to be filed with the IRS a false and fraudulent joint Form 1040 for tax year 2021 that materially underreported MCPHEE and PREDMORE's total income for tax year 2021.

In violation of Title 26, United States Code, 7201.

A TRUE BILL:

Ink signature on file in Clerk's Office
FOREPERSON

DAVID A. HUBBERT
Deputy Assistant Attorney General
Department of Justice, Tax Division

s/Amanda R. Scott
AMANDA R. SCOTT
Trial Attorney
Department of Justice, Tax Division
150 M St. NE
Washington, D.C. 20002
(202) 514-5384
Amanda.R.Scott@usdoj.gov

46

s/Lauren K. Pope
LAUREN K. POPE
Trial Attorney
Department of Justice, Tax Division
150 M St. NE
Washington, D.C. 20002
(202) 746-9068
Lauren.K.Pope@usdoj.gov


s/Corey J. Smith
COREY J. SMITH
Senior Litigation Counsel
Department of Justice, Tax
Division 150 M St. NE
Washington, D.C. 20002
(202) 514-5230
Corey.Smith@usdoj.gov


*Attorneys for the United States*